[Cite as *State v. S.S.*, 2014-Ohio-5352.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 13AP-1060 |
| v. | : | (C.P.C. No. 12CR-4241) |
| [S.S., Sr.], | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on December 4, 2014

---

*Ron O'Brien*, Prosecuting Attorney, *Michael P. Walton*, and *Valerie Swanson*, for appellee.

*Kura, Wilford & Schregardus Co., L.P.A.*, and *Sarah M. Schregardus*, for appellant.

---

APPEAL from the Franklin County Court of Common Pleas

SADLER, P.J.

{¶ 1} Defendant-appellant, S.S., Sr., appeals from a judgment entry of conviction entered by the Franklin County Court of Common Pleas in which he was convicted of one count of felonious assault and two counts of felony child endangering. For the reasons that follow, the judgment of the trial court is affirmed.

I. BACKGROUND

{¶ 2} The charges herein concern appellant's stepdaughter, M.K., and the following factual summary has been taken from the evidence presented at appellant's jury trial that commenced on September 23, 2013. M.K., born on May 5, 1982, was determined to be cognitively disabled. According to an administrator from the high

school she attended, M.K. has a cognitive disability which, in essence, means that her overall intellect is low. Additionally, M.K.'s school records demonstrated that as a junior in high school, her grade-level equivalent was 2.6 or second grade sixth months. M.K.'s biological father, with whom she lived until she graduated from high school, testified that M.K. is unable to live on her own as she is unable to handle her own finances, does not have a driver's license, and is not able to navigate public transportation.

{¶ 3} In June 2010, M.K. began living with her mother, C.S., and appellant. According to M.K., "at first it was okay," but then she started "getting abused" by appellant when he "lost his temper" and was "angry." (Tr. Vol. II, 25.) When asked how often that was, M.K. responded, "[a]lmost every day." (Tr. Vol. II, 25.) M.K. also testified that appellant would hit her with "objects he had next to him" and that he would hit her "arm and [her] rear of [her] leg." (Tr. Vol. II, 25.) M.K. testified the abuse was worse when she told her mother, and she did not tell anyone else due to appellant's threats that he would kill her if she did. M.K. did not tell anyone until August 10, 2012 when she ran to a neighbor's house. When asked why she left her house to go a neighbor, M.K. responded, "I was feared for my life" because "I was getting abused constantly." (Tr. Vol. II, 28.)

{¶ 4} M.K. testified that two days prior to running to her neighbor's house on August 10, appellant burned her with a hot frying pan. Specifically, M.K. testified, "I was standing in front of the stove cleaning off the stove. And he got mad at me and he took the frying pan and burnt it with my arm and back of my neck." (Tr. Vol. II, 27.) M.K. "screamed to get it off of [her]" and "[i]t hurt when he did it." (Tr. Vol. II, 27.) M.K. testified that she neither went to the doctor nor told anyone what had happened, but she heard appellant tell her mother that he "did it on accident." (Tr. Vol. II, 27.) Regarding the events of August 10, M.K. testified, "I just put – just kept running down the street. And when one of my neighbors saw me, she called the cops." (Tr. Vol. II, 28.)

{¶ 5} The state also presented pictures taken on August 10 that depicted the kitchen where M.K. alleged the burning took place and the frying pan M.K. alleged was used to burn her. The photographs also depicted the injuries on M.K.'s neck and arm as well as bruising about her legs, thighs, and chest. When asked how the bruises to her left and right legs were obtained, M.K. responded, "[h]e would hit me with a cane, a brass

cane."  (Tr. Vol. II, 34.)  Photographs taken at the hospital depicted bruising on M.K.'s chest and with respect to the photographs the following exchange occurred:

> Q.  How did you get that bruise?
>
> A.  Toilet brush.
>
> Q.  What?
>
> A.  A toilet brush.
>
> Q.  A toilet brush.  And how did the toilet brush come to cause that bruise?
>
> A.  He hit me with it.
>
> Q.  And when you say he, who are you talking about?
>
> A.  [Appellant].

(Tr. Vol. II, 35.)

{¶ 6}  On August 10, 2012, T.P. was visiting her friend, L.K., who lived near appellant.  While at L.K.'s, T.P. observed M.K., who was not previously known to T.P., "balled up on the floor crying and scared saying, please don't let [appellant] get me."  (Tr. Vol. II, 43.)  Seeing marks on M.K., T.P. called the police.  After the police arrived and were talking with M.K., T.P. saw C.S. and appellant in a car proceeding up the street. Appellant was driving, but he stopped at the corner and got into the passenger's seat while C.S. got into the driver's seat.  According to T.P., C.S. then drove "around the corner" and when the car came back around, appellant was not in the car.  (Tr. Vol. II, 47.)  On cross-examination, T.P. was asked if she had told police that she thought C.S. and appellant were keeping M.K. locked in a dark place, to which T.P. stated, "[s]he said she was locked in the basement and she escaped.  That's how she related it when she had come to [L.K.]'s."  (Tr. Vol. II, 52.)

{¶ 7}  Columbus Police Officer Gregory J. Casanova was the first officer to arrive, and he was advised by L.K. that she had a "frantic female who she had stopped out in the road and taken into her house" to calm her down.  (Tr. Vol. II, 61.)  Upon their first interaction, Officer Casanova described M.K. as "upset crying.  I wouldn't say almost

hysterical, but she was very, very emotional."  (Tr. Vol. II, 61.)  Though asking M.K. to speak with him outside, M.K. told Officer Casanova that she feared being seen by appellant and "she kind of got a little panicky and she actually kind of walked further back into the house."  (Tr. Vol. II, 63.)  M.K. told Officer Casanova she had been assaulted by appellant, and Officer Casanova observed injuries on M.K.  Specifically, Officer Casanova testified:

> She had two very clear visible injuries.  She had a large burn on − I'm sorry − trying to think what arm − it was I want to say her left arm.  And then she had a large burn on the back of her neck.  That's the first thing she showed me.  She moved her hair and just very clear visible mark on the back of her neck.  And she had several bruises she was pointing out on her arms, legs.

(Tr. Vol. II, 64.)

{¶ 8}  Officer Casanova then proceeded to M.K.'s home about "two blocks down the road" but he was unable to find appellant.  (Tr. Vol. II, 65.)  C.S. did not tell police where appellant was, but described to police that appellant was wearing a blue shirt and khaki shorts.  Therefore, Officer Casanova began to look for him in the area, and appellant was located wearing a white shirt and plaid-type shorts.  Columbus Police Detective Aaron Mall testified that he spoke with M.K. and that she was "scared, a little apprehensive to speak with me."  (Tr. Vol. II, 75.)  While walking through the house with M.K., she indicated the type of frying pan that she had been struck with.  Detective Mall recalled that while M.K. had said appellant had threatened her that day, the abuse had occurred earlier.

{¶ 9}  According to M.K.'s hospital records from August 10, 2012, M.K. presented with multiple injuries in various stages of healing, including second-degree burns to her neck and arm.  The burn on M.K.'s neck had yellow crusting and slight scabbing and the burn on M.K.'s arm was scabbed over.  Because the appearance of the burn to her neck was indicative of a possible infection, M.K. was given medication.

{¶ 10} Appellant presented testimony from C.S.'s sister, F.C.  According to F.C., she had never witnessed any inappropriate conduct between appellant and M.K.  However, F.C. admitted that she had not seen M.K. at any time between 2011 and May

2013, which encompassed the time frame within which these incidents were alleged to have happened.

{¶ 11} Appellant also presented the testimony of B.M., who lived next door to appellant and C.S., and had known them for approximately five years.  B.M. also knew M.K. and had known her for approximately two years.  B.M. described her relationship with all three as "friendly," and she testified that M.K. had been in her home on prior occasions without C.S. or appellant.  (Tr. Vol. III, 13.)  According to B.M., immediately prior to August 10, 2012, C.S. called B.M. to come over and check M.K.'s blood sugar level because C.S. was worried about M.K's health.  B.M. testified that at that time, M.K. was "in [appellant] and [C.S.]'s bed.  She looked pale."  (Tr. Vol. III, 19.)  When asked if M.K. had ever been dishonest with her, B.M. replied yes and that is was on more than one occasion.

{¶ 12} C.S. testified that she has known appellant for ten years and that on August 10, 2012, she and appellant went to Circleville to purchase some birds.  According to C.S., they left M.K. at home as they had previously done "[n]umerous times."  (Tr. Vol. III, 30.)  C.S. testified that prior to them leaving, she had been with appellant and M.K. all morning and had not noticed anything unusual between appellant and M.K.  C.S. also testified that on August 9, she found out about the burn on M.K's arm and had treated it on August 10 before she left for Circleville.  However, C.S. testified that she was not aware of the burn on M.K.'s neck.  C.S. also testified that on August 10, she told police that although M.K. lies a lot, C.S. did not "think that she would lie about something like this."  (Tr. Vol. III, 36.)

{¶ 13} On direct-examination, C.S. also testified that she was not aware of any bruising on M.K., but on cross-examination, C.S. testified that M.K. "gets bruises all the time."  (Tr. Vol. III, 41.)  Additionally, C.S. testified she was concerned about M.K.'s behavior on August 9, which prompted her to call M.K.'s doctor and have B.M. come over to check M.K.'s blood sugar level.  C.S. also admitted that she let appellant out of the car when they saw police near their home on August 10, and when asked about the erroneous description given of appellant's clothing, C.S. testified she could not remember what kind of clothes he had on and that she takes "a lot of medication" that "blurs [her] judgment sometimes."  (Tr. Vol. III, 41.)

{¶ 14} On August 20, 2012, appellant was indicted as follows: felonious assault, a second-degree felony, in violation of R.C. 2903.11, as set forth in Count 1; endangering children, a second-degree felony, in violation of R.C. 2919.22, as set forth in Count 2; and endangering children, a third-degree felony, in violation of R.C. 2919.22, as set forth in Count 3. The jury returned verdicts of guilty on all counts. At the sentencing hearing, the trial court imposed a sentence of 5 years incarceration on Count 1, 5 years incarceration on Count 2, and 24 months incarceration on Count 3, all to be served consecutively for an aggregate prison term of 12 years.

## II. ASSIGNMENTS OF ERROR

{¶ 15} On appeal, appellant brings the following assignments of error for our review:

> I. The trial court violated Appellant's rights to due process and a fair trial when, against the manifest weight of the evidence, the trial court convicted Appellant.
>
> II. The trial court erred in entering multiple convictions for offenses that were allied offenses of similar import.

## III. DISCUSSION

### A. First Assignment of Error

{¶ 16} In his first assignment of error, appellant asserts his convictions are against the manifest weight of the evidence. When presented with a manifest weight challenge, an appellate court may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin* at 175.

{¶ 17} In conducting a manifest weight of the evidence review, we may consider the credibility of the witnesses. *State v. Cattledge*, 10th Dist. No. 10AP-105, 2010-Ohio-

4953, ¶ 6. However, in conducting such review, "we are guided by the presumption that the jury, or the trial court in a bench trial, 'is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 18} As is relevant here, R.C. 2903.11(A)(1) provides that no person shall knowingly "[c]ause serious physical harm to another." Additionally, R.C. 2919.22 provides in relevant part:

> (A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.
>
> (B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:
>
> (1) Abuse the child.

{¶ 19} With respect to appellant's convictions for endangering children, R.C. 2919.22(E)(2) provides in relevant part:

> If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following, and, in the circumstances described in division (E)(2)(e) of this section, that division applies:
>
> * * *
>
> (c) If the violation is a violation of division (A) of this section and results in serious physical harm to the child involved, a felony of the third degree;
>
> (d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree.

{¶ 20} Appellant does not challenge that M.K. is a mentally handicapped child under the age of 21 nor that M.K. suffered serious physical harm. Rather, appellant

argues that there is no direct testimony that appellant *knowingly* caused serious physical harm to M.K. so as to support the felonious assault conviction.  It is well established that "[c]ulpable mental states are frequently demonstrated through circumstantial evidence." *State v. Edwards*, 10th Dist. No. 12AP-993, 2013-Ohio-3597, ¶ 12, citing *State v. Ingram*, 10th Dist. No. 11AP-1124, 2012-Ohio-4075, ¶ 22, citing *State v. Ramey*, 10th Dist. No. 11AP-485, 2012-Ohio-1015, ¶ 26, and *State v. Collins*, 89 Ohio St.3d 524, 530 (2000); *State v. Brown*, 99 Ohio App.3d 604, 607 (10th Dist.1994) ("There is no question that, without an admission of some sort by appellants, there can never be direct evidence on the issue of whether appellants acted knowingly.").  Thus, our review will focus on whether reasonable inferences could have been drawn from the facts, which are supported by the evidence, in order to conclude that the acts of appellant were committed knowingly.

{¶ 21} R.C. 2901.22(B) provides that "[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist."  When determining whether a defendant acted knowingly, his state of mind must be determined from the totality of the circumstances surrounding the alleged crime.  *Ingram* at ¶ 22, citing *State v. Hill*, 10th Dist. No. 09AP-398, 2010-Ohio-1687, ¶ 26, citing *State v. Inman*, 9th Dist. No. 03CA0099-M, 2004-Ohio-1420.

{¶ 22} Here, M.K. testified that appellant would hit her with objects when he "lost his temper" and was "angry."  (Tr. Vol. II, 25.)  According to M.K., this occurred "[a]lmost every day."  (Tr. Vol. II, 25.)  Additionally, M.K testified that the burns on her body were caused by a "hot frying pan, it was placed on the stove and it was heated up. * * * I was standing in front of the stove cleaning off the stove.  And he got mad at me and he took the frying pan and burnt it with my arm and back of my neck."  (Tr. Vol. II, 27.)  Though M.K. testified that she heard appellant tell C.S. that he "did it on accident," the jury was free to believe M.K.'s testimony that appellant would strike her when he lost his temper and that he would strike her with "objects he had next to him."  (Tr. Vol. II, 25, 27.)  M.K. also testified that the extensive bruising to both her right and left legs was the result of appellant hitting her "with a cane, a brass cane."  (Tr. Vol. II, 34.)  Additionally,

photographs taken of M.K. on August 10 depicted second-degree burns on M.K.'s arm and neck as well as substantial bruising to both of her legs and her chest.  Given the evidence presented, the jury could reasonably infer from the totality of the circumstances that appellant knowingly caused serious physical harm to M.K.

{¶ 23} Appellant also challenges M.K.'s credibility and asserts that M.K.'s testimony was "not specific and did not fit a logical pattern to allow the jury to conclude that [appellant] was abusing her."  (Appellant's Brief, 11.)  According to appellant, M.K. was not specific in her allegations and failed to "go into any detail about the allegations." (Appellant's Brief, 11.)  We disagree.

{¶ 24} The state presented evidence that on August 10, M.K. had burns on her arm and neck, as well as bruising to her chest and legs.  M.K. testified that appellant would hit her when he was "angry" which was "[a]lmost every day."  (Tr. Vol. II, 25.)  M.K. testified that the burns on her arm and neck were the result of appellant burning her with a hot frying pan two days prior to August 10.  Additionally, M.K. testified that the bruising to her chest was the result of being hit with a toilet brush and the bruising to her legs was the result of being hit with a cane.  Thus, to the extent appellant suggests that his convictions are against the manifest weight of the evidence because M.K.'s testimony is not credible, a conviction is not against the manifest weight of the evidence simply because the jury believed the prosecution's testimony.  *State v. Anderson*, 10th Dist. No. 10AP-302, 2010-Ohio-5561.  " '[W]here a factual issue depends solely upon a determination of which witnesses to believe, that is the credibility of witnesses, a reviewing court will not, except upon extremely extraordinary circumstances, reverse a factual finding either as being against the manifest weight of the evidence or contrary to law.' "  *In re L.J.*, 10th Dist. No. 11AP-495, 2012-Ohio-1414, ¶ 21, quoting *In re Johnson*, 10th Dist. No. 04AP-1136, 2005-Ohio-4389, ¶ 26.  The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.  *State v. Williams*, 10th Dist. No. 02AP-35, 2002-Ohio-4503, ¶ 58; *State v. Clarke*, 10th Dist. No. 01AP-194 (Sept. 25, 2001).

{¶ 25} Upon careful review of the record presented, we cannot conclude this record presents a scenario where the jury clearly lost its way such that a reversal of appellant's

convictions is required. Consequently, we find appellant's convictions are not against the manifest weight of the evidence, and we overrule appellant's first assignment of error.

### B. Second Assignment of Error

{¶ 26} In his second assignment of error, appellant contends the trial court erred in entering multiple convictions for offenses that, under *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, are allied offenses of similar import. Specifically, appellant argues the three charges herein all stem from the allegation that appellant burned M.K. with a frying pan on August 8, 2012. In contrast, the state argues it relied on separate conduct to support each conviction. According to the state, the child endangering charge alleged in Count 2 of the indictment encompassed more than the incident with the frying pan as it encompassed the abuse that resulted in the extensive bruising M.K. had about her body and legs, which, according to M.K, was the result of being struck with a brass cane and toilet brush. Also, the state argues that the child endangering charge alleged in Count 3 of the indictment arose from appellant's failure to seek treatment for the burns on M.K.'s arm and neck. The state also asserts that it was not required to show that all the offenses occurred precisely on August 8, 2012, as the indictment clearly stated the alleged offenses occurred "on or about" August 8, 2012.

{¶ 27} With respect to merger, appellant's counsel stated at the sentencing hearing, "I would suggest that they do merge. If you take a look at the indictment, it indicates that the offenses, the three counts allegedly all took place on August 8th of 2012. And I would suggest that there's no separate animus on these counts." (Nov. 21, 2013 Tr. 7.) In response, the state noted that the photographs taken of M.K. on August 10, 2012 depicted burns to M.K.'s arm and neck as well as extensive bruising to her leg and upper thigh area. Additionally, the state argued that these charges should not merge because they were "not just limited to the frying pan incident but to the other incidents to which [M.K.] testified regarding being struck with fists and other objects." (Nov. 21, 2013 Tr. 11.) At sentencing, the trial court stated, "I do not find that the counts in this case merge for any reason. There was testimony not just to the incident with the frying pan but there was also testimony with respect to her being hit with the cane and other things by you." (Nov. 21, 2013 Tr. 13.)

{¶ 28} In reviewing a trial court's determination of whether a defendant's offenses should merge pursuant to the multiple counts statute, the Supreme Court of Ohio has determined a reviewing court should review the trial court's R.C. 2941.25 determination de novo. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1. "Appellate courts apply the law to the facts of individual cases to make a legal determination as to whether R.C. 2941.25 allows multiple convictions. That facts are involved in the analysis does not make the issue a question of fact deserving of deference to a trial court." *Id.* at ¶ 25.

{¶ 29} The defendant bears the burden of proving an entitlement to merger at sentencing pursuant to R.C. 2941.25. *State v. Mughni*, 33 Ohio St.3d 65, 67 (1987). The conditions required for merger are set forth in R.C. 2941.25(A): "Where the *same conduct* by defendant can be construed to constitute two or more allied offenses of *similar import*, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." (Emphasis added.) Thus, a defendant cannot establish an entitlement to merger without demonstrating that the offenses result from the "same conduct" and share a "similar import." *See State v. Cooper*, 104 Ohio St.3d 293, 2004-Ohio-6553, ¶ 17, quoting *State v. Logan*, 60 Ohio St.2d 126, 128 (1979) (" '*In addition* to the requirement of *similar import* * * *, the defendant, in order to obtain the protection of R.C. 2941.25(A), must show that the prosecution has relied upon the *same conduct* to support both offenses charged.' "). (Emphasis added.) R.C. 2941.25(B) restates these requirements in the negative by prohibiting merger where the offenses are of "dissimilar import" or were "committed separately," but also identifies a third bar to merger where the offenses were committed with a "separate animus as to each." *State v. Cochran*, 10th Dist. No. 11AP-408, 2012-Ohio-5899, ¶ 60.

{¶ 30} In *Johnson*, 2010-Ohio-6314, the Supreme Court of Ohio overruled the analysis previously established in *State v. Rance*, 85 Ohio St.3d 632 (1999), for determining whether two offenses constitute allied offenses of similar import are subject to merger under R.C. 2941.25. Although there was no majority opinion in *Johnson*, the plurality opinion, as well as the concurring justices, stressed the importance of considering the conduct of the accused in the analysis. *See Johnson* at syllabus, with which all justices concurred ("When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must

be considered.  (*State v. Rance* * * * overruled.)").  *State v. Rivera*, 10th Dist. No. 12AP-691, 2014-Ohio-842, ¶ 17.

{¶ 31} The *Johnson* plurality opinion set forth a two-part test for determining whether offenses are allied and required to be merged.  *Rivera* at ¶ 18.  The first question is whether it is possible to commit one offense and commit the other offense with the same conduct.  *Id.*, citing *Johnson* at ¶ 48.  If so, then the offenses are of similar import. If the offenses can be committed by the same conduct, the test requires the court to " 'determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." ' "  *Id.*, quoting *Johnson* at ¶ 49, quoting *State v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569 (Lanzinger, J., dissenting).

{¶ 32} " 'After *Johnson*, we look to the evidence and, "if that evidence reveals that the state relied upon the 'same conduct' to prove the two offenses, and that the offenses were committed neither separately nor with a separate animus to each, then the defendant is afforded the protections of R.C. 2941.25, and the trial court errs by imposing separate sentences for the offenses." ' "  *Id.* at ¶ 19, quoting *State v. Drummonds*, 1st Dist. No. C-110011, 2011-Ohio-5915, ¶ 6, quoting *State v. Strong*, 1st Dist. No. C-100484, 2011-Ohio-4947, ¶ 67.  More recently, in *Williams*, 2012-Ohio-5699, the Supreme Court sought to further clarify *Johnson*.  In discussing its decision in *Johnson*, the *Willliams*' court stated: "[T]his court held that in making an allied-offenses determination, a court should not employ an abstract analysis, but instead should consider the statutory elements of each offense in the context of the defendant's conduct."  *Williams* at ¶ 20.  As will be explained, we conclude appellant has failed to prove that the state relied on the same conduct to support the offense of felonious assault and the offenses of child endangering.

{¶ 33} In *State v. Overton*, 10th Dist. No. 09AP-858, 2011-Ohio-4204, the defendant was separately sentenced on counts of felonious assault and child endangering based on events resulting in the death of a four-year-old child.  *Id.* at ¶ 2.  At trial, the state presented evidence establishing that the defendant punched the child in the head while the child was in the shower, causing the child to fall down.  *Id.* at ¶ 11.  The defendant then removed the child from the shower and threw him into the arms of the defendant's girlfriend.  *Id.*  When the child became able to crawl away, the defendant kicked him in the legs and buttocks, picked him back up, and again threw him into the girlfriend's arms.

*Id.* The defendant punched the child "at least three times" after the child had been removed from the shower. *Id.* The defendant's girlfriend called 911 when she saw the child's eyes roll back in his head. *Id.*

{¶ 34} Relying on *Cooper* and *Logan*, this court found that merger was inappropriate because the defendant had "not shown that both convictions were based on a single act of abuse." *Overton* at ¶ 15. While it was clear that the state relied on the blows to the child's chest as the basis for the felonious assault conviction, it was unclear which blow the state relied on to support the child endangering conviction: the state's argument for child endangering "was only based on the fact that appellant struck [the victim], without indicating whether this was the blow to the head delivered in the shower or the later blows to the chest." *Id.* Because "[t]here was sufficient evidence for the jury to conclude that appellant committed child endangering through child abuse by striking [the child] in the head while he was in the shower," we held the defendant failed to establish that the offenses resulted from the same conduct. *Id.*

{¶ 35} Similarly in *State v. Damron*, 10th Dist. No. 12AP-209, 2012-Ohio-5977, this court rejected the defendant's argument that his convictions were required to be merged under R.C. 2941.25. According to the recitation of facts as presented by the state, the defendant repeatedly struck the victim on June 21, 2008, resulting in a concussion, nasal fracture, and cuts and contusions over her entire body. At the time of the incident, the victim's three children were present and witnessed the defendant striking the victim. Additionally, blades from the ceiling fan in the room where the incident occurred had been removed and were found with blood on them. The state's facts also revealed that the defendant repeatedly stopped his attack on the victim in order to respond to the children's actions. As set forth in *Damron*, in one instance, a child jumped on the defendant's back and told him to stop, causing the defendant to pick up the child and set the child down on the bed in the same room whereupon the defendant resumed beating the victim. At another time during the incident, a child took a knife from the kitchen in an attempt to help the victim causing the defendant to throw a fan at the child. The defendant stipulated to the facts for purposes of the plea.

{¶ 36} The state argued that even though there was a continuous set of abuse, there were separate acts such that the offenses were not subject to merger. In contrast, the

defendant argued the offenses were based on one continuous act. After review, the trial court concluded the offenses were committed with a separate animus and did not merge.

{¶ 37} On appeal, the defendant repeated his argument that the offenses were committed at the same time and place against the same victim with the same conduct and animus. Rejecting the defendant's contention that his actions against a single victim at one location over one evening resolved the issue, this court stated that it "must examine whether the defendant engaged in separate conduct, or acted with a separate state of mind." *Id.* at ¶ 24, citing *Johnson*, 2010-Ohio-6314, at ¶ 54. In concluding that the offenses did not merge, the *Damron* court stated:

> As in *Johnson* and *Overton*, the record supports the state's contention that defendant committed two separate instances of abuse, with blows to the victim's face and blows to her body. *Johnson* at ¶ 56; *Overton* at ¶ 15. Since intervals of time separated defendant's blows to the victim, the trial court properly could ascertain that a separate animus motived the instances of violence. [*State v. White*, 10th Dist. No. 10AP-34, 2011-Ohio-2364,] ¶ 67, citing *State v. Williams*, 124 Ohio St.3d 381, 2010-Ohio-147, ¶ 24; *State v. Davic*, 10th Dist. No. 11AP-555, 2012-Ohio-952, ¶ 16 (holding that multiple rape offenses do not merge when a defendant commits them between " 'intervening acts' "), quoting *State v. Jones*, 78 Ohio St.3d 12, 14 (1997).

*Id.* at ¶ 25.

{¶ 38} To prove the indicted offenses in the case sub judice, the state presented evidence of separate acts, one involving a frying pan and one involving a brass cane. Though it is not clear which count was based on the incident with the frying pan and which count was based on the incident with the brass cane, contrary to appellant's assertion, the evidence does not show that the state relied *only* on the incident with the frying pan to support both Counts 1 and 2. *Cochran*; *Overton*. Additionally, while there is evidence the offenses were committed against the same victim, there is no evidence the offenses were committed at the same time or at the same location. Moreover, Count 3 encompasses appellant's violation of his duty of care, protection or support by his failure to seek medical attention for the second-degree burns that resulted from him striking

M.K. with a hot frying pan.  Accordingly, we do not find that appellant has demonstrated the alleged offenses were committed with the same conduct.

{¶ 39} Further, because the indictment alleges the three offenses occurred on or about August 8, 2012, we disagree with appellant that the state was required to prove that all three offenses occurred precisely on August 8, 2012.  "In a criminal charge the exact date and time are immaterial unless in the nature of the offense exactness of time is essential.  It is sufficient to prove the alleged offense at or about the time charged."  *Tesca v. State*, 108 Ohio St. 287 (1923), paragraph one of the syllabus.  Where the precise date and time of a violation of the statute are not essential elements of the crime, an indictment need not allege a specific date of the offense.  *State v. Sellards*, 17 Ohio St.3d 169, 171-72 (1985).  "The General Assembly, in declaring what shall be sufficient in an indictment, provided, among other things, that it shall be sufficient if it can be understood that the offense was committed at some time prior to the time of the filing of the indictment."  *Id.* at 171, citing R.C. 2941.03(E).  Proof of the offense on or about the alleged date is sufficient to support a conviction even where evidence as to the exact date of the offense is in conflict.  *Cochran* at ¶ 82, citing *State v. Dingus*, 26 Ohio App.2d 131, 137 (4th Dist.1970).  The exact date is not essential to the validity of the conviction and the failure to prove that is of no consequence.  *Id.*, citing *Dingus*.  The state's only responsibility is to present proof that the offenses alleged in the indictment occurred reasonably within the time frame alleged.  *Sellards* at 171; *Cochran* at ¶ 82; *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶ 50.

{¶ 40} At trial, M.K. testified that appellant hit her when he lost his temper and was angry.  According to M.K., this occurred "[a]lmost every day."  (Tr. Vol. II, 25.)  Specifically with respect to the incident with the frying pan, M.K. testified that it occurred two days prior to the day she ran to her neighbor's on August 10.  Though M.K. did not testify as to the exact date that the incident occurred wherein appellant allegedly hit her with a brass cane, she did testify that the extensive bruising that appeared in photographs taken on August 10, 2012 resulted from that incident.  Further, M.K.'s medical records of August 10, 2012 established the injuries on M.K.'s person were in various stages of healing.  Given the state of M.K.'s injuries on August 10, the trier of fact could infer that the incident with the brass cane occurred reasonably within the time frame alleged in the

indictment, i.e., on or about August 8.  *State v. Schaaf*, 5th Dist. No. 07 CA 55, 2008-Ohio-2689, ¶ 31; *Cochran*; *Barnhart*.

{¶ 41} Upon review, we conclude appellant has failed to show the offenses herein were committed with the same conduct such that they are subject to merger under R.C. 2941.25(A).  Consequently, we conclude the offenses do not merge, and we overrule appellant's second assignment of error.

## IV. CONCLUSION

{¶ 42} Having overruled both of appellant's asserted assignments of error, we hereby affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and LUPER SCHUSTER, JJ., concur.

_____