[Cite as *State v. Finley*, 2024-Ohio-2636.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,            :

                         No. 113247

    v.                             :

DEVONTE FINLEY,                         :

    Defendant-Appellant.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 11, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-676154-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey M. Maver, Assistant Prosecuting Attorney, *for appellee.*

Mary Catherine Corrigan, *for appellant.*

MICHAEL JOHN RYAN, J.:

{¶ 1} Defendant-appellant Devonte Finley appeals his conviction for the murder of his half-brother, Keith Jackson, Jr., and associated crimes. After a thorough review of the facts and pertinent law, we affirm.

**Factual and Procedural History**

{¶ 2} The deadly shooting occurred on October 26, 2022, at the home of appellant and the victim's maternal grandmother, where both of the men lived.[1] Along with appellant and the victim, their close family friend, Demetrius Craig, was present at the home at the time of the shooting. Appellant absconded after the shooting; it was believed that he had fled to South Carolina. In early November 2022, law enforcement located appellant on Interstate 77 in southeastern Ohio, whereupon an approximate 14-minute, high-speed chase occurred on the interstate; law enforcement was eventually able to apprehend him.

{¶ 3} In late November 2022, appellant was charged in a six-count indictment as follows: Count 1, aggravated murder, an unclassified felony in violation of R.C. 2903.01(A); Count 2, murder, an unclassified felony in violation of R.C. 2903.02(A); Count 3, murder, an unclassified felony in violation of R.C. 2903.02(B); Count 4, felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(1); Count 5, felonious assault, a felony of the second degree in violation of R.C. 2903.11(A)(2); and Count 6, having weapons while under disability, a felony of the third degree in violation of R.C. 2923.13(A)(2). Counts 1 through 5 contained one- and three-year firearm specifications.

{¶ 4} Appellant waived his right to a jury trial on Count 6, having weapons while under disability, and that count was tried to the bench. The remaining counts

---

[1] Appellant and the victim have the same biological mother.

proceeded to a jury trial. At the close of the State's case, appellant made a Crim.R. 29 motion for judgment of acquittal, which the trial court denied. The defense rested without presenting any witnesses and renewed its Crim.R. 29 motion; the motion was denied again. The following facts were established at trial.

{¶ 5} On the day of the shooting, Craig was "chilling" with appellant and the victim at the subject house. They initially were in the living room. Appellant and the victim had "words," and a physical confrontation ensued. Craig separated the two. The trio went outside, where "words" and the physical confrontation between appellant and the victim continued.

{¶ 6} A neighbor, Raquid Graham, was arriving home from work as the confrontation ensued in the front yard. Graham knew all three of the relevant men — appellant, the victim, and Craig — on a "friendly neighbor" basis.[2] Graham observed the victim's pickup truck was parked in the home's "one lane" driveway, behind Craig's vehicle. According to Graham, Craig was standing between the victim and appellant, attempting to keep them separated; Craig was doing his best to "de-escalate" the situation. Graham saw appellant go back into the home and heard Craig talking with the victim outside of the home. Graham assumed the altercation was over and walked to the side door of his own house. Graham heard gunshots as he was entering his house.

---

[2] Although Craig did not live at the subject house, he was a frequent visitor.

{¶ 7} Craig testified about what happened inside the subject house. After the front yard incident, Craig, appellant, and the victim all went back into the house. The victim stood by the front door, while Craig and appellant were in an opposite corner, near a couch. Appellant was still "mad" and picked up a gun. Craig attempted to get the gun from appellant but was unable. Appellant then fired several shots at the victim from across the room, hitting the victim multiple times. The victim ran down a hallway to a back bedroom.

{¶ 8} Appellant told Craig he could leave but Craig did not want to leave the victim, who was alive at that time. Appellant picked up items from a coffee table, which included Craig's car keys and cell phone and exited the home. Momentarily thereafter, appellant returned, went to the bedroom where the victim was, and shot the still-alive victim several more times.

{¶ 9} Graham, the neighbor, heard the second round of shots as well and after a few moments decided to go back outside, where he encountered a "scared looking" Craig who told him to call 911, which Graham did. Appellant was also outside too. Appellant said to Graham, "I wasn't here." Graham testified that when he went outside after hearing the second round of shots, he saw Craig's vehicle had been moved to the street and the victim's pickup truck was no longer in the driveway. Graham saw the pickup truck being driven away, but he could not see who the driver was.

{¶ 10} According to Craig, appellant was the driver of the victim's pickup truck and, before appellant drove away, he threw his (Craig's) car keys and cell

phone out the window onto the front lawn. Craig then went back inside the house and stayed with the victim until first responders arrived.

{¶ 11} Craig has an extensive criminal record and, at the time of the shooting, was on parole for one of his criminal cases. Thus, as he testified at trial, while on the scene, he called his attorney to ask for advice. He also called the victim's mother and his own father. Craig testified that he did not call first responders because he already knew Graham, the neighbor, had called. When the first responders arrived, Craig left the scene without speaking to the police on the advice of his attorney. Craig went to see his attorney the following day, and he and his attorney subsequently went to speak with homicide detectives. Craig voluntarily allowed the police to collect a DNA sample from him.

{¶ 12} The victim succumbed to his injuries at the hospital. An autopsy was performed, and it revealed that the victim had 14 gunshot wounds to his body. Multiple bullets were retrieved from the victim's body. The victim also had some abrasions on his body, and the deputy medical examiner opined that they were likely made within a day of his death.

{¶ 13} A firearms expert examined the bullets that were retrieved from the victim's body. Four bullets were identifiable, and the expert determined that they were from the same firearm. DNA was recovered from under the victim's fingernails; the DNA matched appellant's DNA, as did DNA found on the victim's shirt.

{¶ 14} The lead investigating detective was Stephen Loomis from the Cleveland Police Department. Detective Loomis noticed that there was a doorbell camera near the front door of the grandmother's house where the shooting occurred. He learned that appellant's aunt, who resided in South Carolina, was the only person who could access the video footage. The detective contacted the aunt and requested the footage. The aunt only sent a portion of the footage from earlier in the day of the incident before the altercation and, despite numerous requests from Detective Loomis for the relevant footage, she did not respond. Law enforcement contacted the manufacturer of the camera system and learned that the footage relative to the time of the altercation had been erased.

{¶ 15} During his investigation, Detective Loomis learned of, and contacted, appellant's girlfriend. According to the girlfriend, appellant had fled to South Carolina. The police located the victim's vehicle parked in the girlfriend's designated spot at her apartment complex.

{¶ 16} Law enforcement contacted the Ohio fugitive task force, who worked with its counterpart in South Carolina, in an attempt to locate and apprehend appellant. A warrant was obtained and executed for his aunt's house, but appellant was not located there. Law enforcement later learned from the United States Marshals Service that appellant intended to return to northeast Ohio to "harm a family member, acquaintance, or girlfriend." After learning this information, the Ohio and South Carolina task forces worked with the Ohio State Highway Patrol to track appellant's location.

{¶ 17} Appellant was located in southern Ohio driving in a vehicle registered under the victim's name. Law enforcement attempted to stop appellant, but appellant led them on a 14-minute, high-speed chase on Interstate 77, where appellant drove at a speed as high as 120 miles per hour. Appellant evaded four sets of "stop sticks" and struck multiple vehicles during the chase but was eventually apprehended. Appellant spoke with the police that same day; he did not implicate Craig in the victim's death.

{¶ 18} On this evidence, the jury returned guilty verdicts on Count 3, murder, in violation of R.C. 2903.02(B), and Count 5, felonious assault in violation of R.C. 2903.11(A)(2), along with the accompanying firearm specifications. The jury returned not guilty verdicts on the remaining counts it considered. The trial court found appellant guilty of Count 6, having weapons while under disability.

{¶ 19} The parties agreed that the convictions on Counts 3 and 5 merged for the purpose of sentencing, and the State elected to proceed on Count 3. On that count, the trial court sentenced appellant to three years on the accompanying firearm specification to be served prior and consecutive to a term of life with the possibility of parole after 15 years on the underlying offense. Regarding the firearm specification attendant to Count 5, the trial court sentenced appellant to a three-year term, to be served consecutive to the three-year term on the firearm specification under Count 3. On Count 6, the trial court sentenced appellant to 36 months to be served consecutive to the sentences on Counts 3 and 5. Thus, appellant's aggregate sentence is 24 years to life.

{¶ 20} Further facts will be discussed below as are necessary relative to the assignments of error.

**Assignments of Error**

    I.       The appellant's waiver of counsel was not intelligently and voluntarily entered.

    II.     The trial court erred by prohibiting the appellant from cross examining Det. Loomis on his racist social media posts pursuant to *Giglio* [*v. United States*, 405 U.S. 150 (1972)].

    III.    The guilty verdict cannot be upheld because the evidence and testimony presented at trial did not establish the appellant's guilt beyond a reasonable doubt.

**Law and Analysis**

**Appellant Was Not Deprived of His Right to Counsel**

{¶ 21} After being indicted, appellant was declared indigent and the trial court appointed two attorneys to represent him. The record shows that the two attorneys remained as appellant's counsel throughout the case and advocated on his behalf by, for example, engaging in ongoing discovery and negotiations with the State and requesting and being granted funds for an investigator. Both attorneys appeared and participated in appellant's defense at trial.

{¶ 22} However, during a lunch break at trial, one of appellant's attorneys fell ill and went home for the day. At the time of the lunch break, the State had a witness, Cleveland police Detective Walter Emerick, on the witness stand for direct examination. When court reconvened after the break, the parties informed the trial court about the attorney's illness and departure. The trial court indicated that it

desired to finish the examination of Detective Emerick and then conclude for the day. The trial court asked appellant, his remaining defense attorney, and the assistant prosecuting attorney if they had any objection to its proposal; all indicated that they did not. The State concluded its direct examination of the detective, and the defense chose not to cross-examine him.

{¶ 23} Detective Emerick was from the "crime scene and record unit" of the Cleveland Police Department. The sum and substance of the detective's testimony was to explain what evidence had been collected from the crime scene, how it was processed, and what entity got the evidence after it was processed.

{¶ 24} In his first assignment of error, appellant contends that his waiver of the presence of his sick attorney was not intelligently and voluntarily given. According to appellant, he was "guaranteed the right to two . . . qualified attorneys to represent him" because of the aggravated murder charge. Appellant does not provide a citation for his contention. The State contends that an indigent defendant's entitlement to two attorneys only applies in capital cases.

{¶ 25} A trial court "shall appoint at least two attorneys" for an indigent defendant who is "charged with aggravated murder and the indictment includes one or more specifications of aggravating circumstances listed in R.C. 2929.04(A)." Ohio Supreme Court Rules for Appointment of Counsel in Capital Cases,

5.02(A)(1).[3] R.C. 2929.04(A) governs the "criteria for imposing death or imprisonment for a capital offense." This case was not a capital case. Further, Cuyahoga C.P., Gen.Div., Loc.R. 33.0, which governs the "assignment and compensation of counsel to defend" only contains two sections relative to how many attorneys an indigent defendant is entitled to. First, under Part I (A)(6), the rule governs death penalty cases and provides that assignment of counsel is governed "solely" by the aforementioned Ohio Supreme Court Rules for Appointment of Counsel in Capital Cases. The other provision is found under Part 1 (F), and provides that "[a]s a general rule, only one attorney shall be assigned to all of an indigent defendant's pending cases."[4]

{¶ 26} Regardless of whether appellant was "guaranteed" two attorneys, the record indicates that he had two attorneys representing him throughout this case.

---

[3] Subsection (2) of the rules also provides for two attorneys in cases involving indigent juveniles charged with aggravated murder and an aggravating circumstance under R.C. 2929.04(A), "even though the defendant is under eighteen years of age [and] cannot be sentenced to death." Ohio Supreme Court Rules for Appointment of Counsel in Capital Cases, 5.02(A)(2). Appellant was neither a juvenile at any time relevant herein and was not charged with a capital offense.

[4] At oral argument, Finley's appellate counsel acknowledged that Loc.R. 33.0 does not explicitly provide that two attorneys must be appointed for an indigent defendant in a noncapital aggravated murder case but cited to the "assigned counsel fee schedule" portion of the rule in support of the contention that implicitly two are required. The fee schedule for aggravated murder without death penalty specifications provides a rate if there is one attorney ($12,750) or two attorneys ($21,250). It does not support counsel's contention that it is mandatory that two attorneys be appointed to an indigent defendant's case on a noncapital aggravated murder case. Rather, it supports the State's contention that two attorneys for an indigent defendant are only required in a capital aggravated murder case; one or two may be appointed in a noncapital case. Thus, while it may be the practice of the Cuyahoga County Court of Common Pleas to appoint two attorneys in a noncapital aggravated murder case, there is no authority requiring it.

There is no indication in the record that appellant's consent to the brief absence of one of his attorneys during trial was anything but knowingly and voluntarily given.

{¶ 27} Appellant cites *Euclid v. Hedge*, 2022-Ohio-464 (8th Dist.), in support of his contention that his waiver to one of his counsel not being present was not knowingly and voluntarily made because the trial court did not engage in an extensive discussion with him. *Hedge* is distinguishable from this case.

{¶ 28} In *Hedge*, the defendant waived her right to counsel and proceeded pro se at trial. This court found that the trial court's "cursory colloquies" with the defendant "did not advise her of the dangers and disadvantages of self-representation, potential defenses, and applicable mitigating circumstances." *Id.* at ¶ 11.

{¶ 29} Here, appellant did not entirely waive the right to counsel and proceed pro se. Rather, for a limited portion of the trial — the direct examination of one of the State's witnesses — appellant waived the appearance of one of his defense attorneys because she was ill. Moreover, the witness's testimony was straightforward and no cross-examination was conducted. By appellant's admission, his remaining attorney was "competent counsel." Appellant's brief, p.13.

{¶ 30} Appellant was represented by counsel at all stages of this proceeding and knowingly and voluntarily waived the appearance of one of his two attorneys for a limited portion of the trial because the attorney was ill.

{¶ 31} The first assignment of error is overruled.

**There was no *Giglio* Violation**

{¶ 32} For his second assignment of error, appellant contends that the trial court erred by prohibiting him from cross-examining, pursuant to *Giglio*, 405 U.S. 150, Detective Loomis's social media posts, which could be deemed racist.[5]

{¶ 33} In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment[.]" *Id.* at 87. "There are three components of a true *Brady* violation: [(1)] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the State, either willfully or inadvertently, and [(3)] prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-282 (1999).

{¶ 34} The Supreme Court extended its holding in *Brady* when it decided *Giglio*. In *Giglio*, the prosecution failed to disclose a promise that it had made to its main witness. The prosecuting attorney who presented the case to the grand jury promised the witness that he would not be prosecuted if he cooperated and agreed to testify. On cross-examination at trial, the witness testified that he had not received any promises in exchange for his testimony; the prosecution did not correct the false testimony.

---

[5] Detective Loomis is white, and appellant is black, as was the victim.

{¶ 35} In *Giglio*, the government's case against the defendant was "almost entirely" dependent on the witness's testimony and "without it there could have been no indictment and no evidence to carry the case to the jury." *Id.* at 154.

{¶ 36} *Brady* and *Giglio* do not apply here because the subject information — Detective Loomis's social media posts — was publicly available information; it was neither in the State's sole possession nor suppressed by the State. Indeed, by defense counsel's admission at trial, the detective put the material "on the Internet for people to see." "*Brady* does not apply to materials that are not 'wholly within the control of the prosecution.'" *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir. 2003), quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). "There is no need to require the state to 'disclose' material that is readily available to the defense." *State v. McGuire*, 2018-Ohio-1390, ¶ 24 (8th Dist.).

{¶ 37} Instead of analyzing the issue appellant presents under *Brady/Giglio*, the appropriate review should be conducted under the rules of evidence. Evid.R. 608, which governs the admission of evidence of the character and conduct of witnesses provides in relevant part as follows:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness . . . concerning the witness's character for truthfulness or untruthfulness . . . .

Evid.R. 608(B).

{¶ 38} Whether a defendant is permitted to question a witness about prior instances of conduct pursuant to Evid.R. 608(B) is a decision that rests in the sound discretion of the trial court, and it will not be reversed absent an abuse of discretion. *State v. Cassano*, 2002-Ohio-3751, ¶ 45.

{¶ 39} Under this rule, particular instances of conduct, though not the subject of a criminal conviction, may be inquired into on cross-examination of a principal witness. *State v. Miller*, 1998 Ohio App. LEXIS 3643, 3 (12th Dist. Aug. 10, 1998), citing *State v. Williams*, 1 Ohio App.3d 156, 157 (10th Dist. 1981). However, "because the potential for abuse is high, through unfair prejudice, confusion of the issues, and misleading of the jury, safeguards are erected in the form of requiring that the instances inquired into must be *clearly* probative of truthfulness or untruthfulness." (Emphasis in original.) *Williams* at *id*. "Evid.R. 608(B) . . . protects a legitimate state interest in preventing criminal trials from bogging down in matters collateral to the crime with which the defendant was charged." *State v. Moshos*, 2010-Ohio-735, ¶ 18 (12th Dist.).

{¶ 40} Further, under Evid.R. 402, "[t]he general principle that guides admission of evidence is that '[a]ll relevant evidence is admissible . . . .'" *State v. Morris*, 2012-Ohio-2407, ¶ 11, quoting Evid.R. 402. Evid.R. 403 provides "exceptions to this general principle and provides circumstances for the exclusion of relevant evidence." *Morris* at *id.*, citing Evid.R. 403. One such exception is that relevant evidence is not admissible when "its probative value is substantially

outweighed by the danger of unfair prejudice," among other things. *State v. Brown*, 2012-Ohio-1848, ¶ 31 (2d Dist.), citing Evid.R. 402 and 403(A).

{¶ 41} The trial court did not abuse its discretion by precluding the defense from cross-examining Detective Loomis about his past social media posts. Appellant contends that the detective's posts tended to demonstrate that he was a racist and that his "personal views colored the investigation in a negative light." According to appellant, "[i]nstead of doing his job and finding out who killed [the victim], Det. Loomis looked towards the nearest, and easiest young black man to pin this murder on."

{¶ 42} The State's "star" witness was appellant's and the victim's friend, Craig. Craig was present for the incident and unequivocally testified that appellant shot the victim in two separate shootings. Graham, the neighbor, saw appellant and the victim outside fighting and Craig was trying to diffuse the altercation. Although Craig left the scene without first speaking to law enforcement, he explained why he did, and he voluntarily met with the police and cooperated with their investigation.

{¶ 43} Further, although Detective Loomis was unable to get the security camera footage from the house where the shooting occurred, it was not because he just wanted to "pin" the murder on appellant. Rather, appellant's aunt would not release the pertinent footage and eventually the recording was deleted. Moreover, other law enforcement officials worked on the case in addition to Detective Loomis.

{¶ 44} On this record, the trial court did not abuse its discretion by not allowing the defense to cross-examine Detective Loomis on his past social media

posts. The probative value of the material was substantially outweighed by the danger of unfair prejudice, especially in light of all the other evidence.

{¶ 45} The second assignment of error is overruled.

**The Weight of the Evidence Supports Appellant's Conviction**

{¶ 46} In his third assignment of error, appellant contends that his conviction is against the weight of the evidence.

{¶ 47} When evaluating a claim that a jury verdict is against the manifest weight of the evidence, "we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Reversing a conviction based upon the weight of the evidence should occur "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 48} The eyewitness' (Craig's) account of the murder was corroborated by other objective evidence. First, the neutral testimony of the neighbor, Graham, was that he saw appellant and the victim fighting in the front yard and Craig was trying to diffuse the altercation. Graham heard the two sets of gunfire, and appellant told him, "I wasn't here." The victim's pickup truck, which Craig said appellant fled in, was located at the apartment complex of appellant's girlfriend.

{¶ 49} The forensic evidence revealed appellant's DNA was under the victim's fingernails and on his clothing. None of Craig's DNA was found on the victim. And although Craig initially left the scene without speaking with law enforcement, he explained why he did that and in short order cooperated with law enforcement investigating the case.

{¶ 50} Appellant, on the other hand, not only fled the scene, but he also fled the jurisdiction. Appellant was apprehended after leading law enforcement on a high-speed chase on Interstate 77, during which he evaded four sets of "stop sticks" and hit numerous vehicles.

{¶ 51} On this record, appellant's conviction is supported by the weight of the evidence. The third assignment of error is overruled.

{¶ 52} Finally, we note that appellant labeled "Issues with Juror Number 11" in his brief but did not assign any error or discussion to the "issues." It is not our duty to craft appellant's arguments for him. *Nob Hill E. Condo. Assn. v. Grundstein*, 2011-Ohio-2552, ¶ 11 (8th Dist.); *Strauss v. Strauss*, 2011-Ohio-3831, ¶ 72 (8th Dist.); *see also* App.R. 16(A)(7) (An appellant's brief shall include "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.").

{¶ 53} We briefly note, however, that, upon being voir dired after the trial started, the juror informed the court that she formerly managed someone who

apparently was a spectator in the courtroom but the juror did not know anything about the spectator's personal life (i.e., she did not know if the apparent spectator was there in support of appellant), and the juror's "indifferent relationship" with the spectator would not affect her ability to fairly and impartially sit on the jury. In an exercise of caution, the juror simply thought she should inform the court that she knew the apparent spectator.

{¶ 54} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

KATHLEEN ANN KEOUGH, A.J., and
MICHELLE J. SHEEHAN, J., CONCUR