[Cite as *State v. Duncan*, 2024-Ohio-5610.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 21AP-151 |
| | | (C.P.C. No. 19CR-3753) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Christopher E. Duncan, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on November 26, 2024

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Darren M. Burgess*, for appellee.

**On brief:** *Bellinger & Donahue*, and *Kerry M. Donahue*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Christopher E. Duncan, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of aggravated robbery, kidnapping, felonious assault, and having weapons while under disability. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed August 1, 2019, plaintiff-appellee, State of Ohio, charged Duncan with two counts of aggravated robbery, in violation of R.C. 2911.01, felonies of the first degree; two counts of kidnapping, in violation of R.C. 2905.01, felonies of the first degree; two counts of felonious assault, in violation of R.C. 2903.11, felonies of the second degree; and one count of having weapons while under disability, in violation of R.C.

2923.13, a felony of the third degree. All the charges except for the having weapons while under disability charge contained accompanying three-year firearm specifications pursuant to R.C. 2941.145(A), and repeat violent offender ("RVO") specifications pursuant to R.C. 2941.149(A). The charges related to the June 2019 robbery and assault of E.R. and D.H. Duncan entered a plea of not guilty.

{¶ 3} The matter proceeded to a jury trial in March 2021. At the trial, D.H. testified he and E.R., his then-fiancée, were active drug users in June 2019. During that time, D.H. said he and E.R. were living in E.R.'s vehicle and that Duncan was their drug dealer. D.H. testified he had known Duncan for five or six months and purchased drugs from him repeatedly during that time frame, paying either with money or by arranging to perform chores around Duncan's residence. Throughout the months he knew Duncan, D.H. admitted he stole drugs and money from Duncan five or six times.

{¶ 4} Late in the evening on June 11, 2019, D.H. drove to Duncan's house with E.R. D.H. testified the purpose of their visit was to purchase fentanyl from Duncan. Upon arriving to Duncan's residence, D.H. went inside and said Duncan and another individual nicknamed "Quan" pulled guns on him and began to order him around. (Mar. 5, 2021 Tr. Vol. III at 246.) D.H. said Duncan and Quan removed his clothes and searched his person, and they then ordered D.H. to put his clothes back on and took Duncan outside. Once outside, D.H. said Duncan and Quan removed E.R. from her car, searched E.R., and then searched the vehicle. During the search of the vehicle, D.H. said Duncan found some of the property D.H. had previously stolen from Duncan, so in retaliation Duncan took firearms, a laptop, and money from the vehicle. D.H. testified Duncan also found a "stash can" inside the vehicle, and Duncan knew the item was his and that D.H. had previously stolen it. (Tr. Vol. III at 249.) At that point, D.H. said Duncan began pistol whipping both he and E.R. and then forced them both inside Duncan's residence.

{¶ 5} Back inside the house, D.H. said Duncan called a third, unnamed person who arrived about 15 minutes later. D.H. testified Duncan and the two other men discussed what they should do with D.H. and E.R., and D.H. said he begged them to only kill him but let E.R. live. The three men then discussed letting Duncan's dogs attack D.H. and E.R. or forcing E.R. to shoot D.H. so that she would be found with gunpowder residue on her hands and clothes.

{¶ 6} D.H. testified Duncan tried to incite his dogs to attack D.H. and E.R. but Duncan was unsuccessful. At that point, D.H. said Duncan decided he would kill both D.H. and E.R. by taking them to Smith Road Park and forcing them to inject themselves with lethal doses of fentanyl. D.H. testified Duncan then prepared two syringes containing fentanyl and forced D.H. and E.R. at gunpoint to get into E.R.'s car. D.H. said Quan and the unidentified third individual drove D.H. and E.R. to Smith Road Park and that Duncan followed by himself in a black Camaro. D.H. estimated he and E.R. were inside the house with the men for several hours before they were forced back into the vehicle.

{¶ 7} D.H. testified they arrived at Smith Road Park around 5:00 a.m. on June 12, 2019 and that he did not notice anyone in the park as Duncan marched them at gunpoint to a footpath behind the maintenance building. Once they were on a secluded path, D.H. said Duncan ordered he and E.R. to sit on the ground and handed them each a syringe full of fentanyl. D.H. said Duncan, still pointing a gun at them, ordered D.H. and E.R. to inject themselves with the syringes or they would be shot. Additionally, D.H. testified Duncan told them he wanted to see the "flashback" of blood in the syringes when they were injected so he would know that the fentanyl was going directly into their veins. (Tr. Vol. III at 258.)

{¶ 8} Pursuant to his testimony, D.H. said E.R. injected herself first and immediately began convulsing and gasping for breath. D.H. said it took him longer to inject himself due to the injuries he had sustained to his hands during the beating. When he did eventually inject the syringe into his arm, D.H. said he injected only a small amount into his vein and then manipulated the syringe to inject the rest into muscle to delay the effect of the drug and to allow him to play dead before the fentanyl took effect. D.H. testified that as he was playing dead, Duncan watched for some time to see if D.H. and E.R. had stopped breathing.

{¶ 9} D.H. testified Duncan eventually walked away, and D.H. said he then got up and ran in the opposite direction. As he ran, D.H. said he heard two gunshots. D.H. continued to run until he reached a residential area where he started to bang on doors while Duncan pursued him in his black Camaro. When he saw that Duncan was following him, D.H. said he hopped several fences, ran to the next street, and found someone who called law enforcement.

{¶ 10} Zachariah West, an officer with the Columbus Division of Police, testified he responded to a home on Berkeley Road at 5:40 a.m. on June 12, 2019 on the report of a disturbance. When he arrived at the home, Officer West said he found D.H. battered, bloody, and "hysterical" as he described what had just happened to him and E.R. (Tr. Vol. II at 139.)

{¶ 11} Jason Barnett, a buildings and grounds department employee of Columbus City Schools, testified he arrived at Smith Road Park on the morning of June 12, 2019 to start his workday when he saw a black Camaro as he drove into the park. Barnett said the driver of the Camaro stopped the vehicle, turned off the lights, and watched and waited as Barnett walked toward the building. As he walked, Barnett said he heard two gunshots and saw two men running from behind the maintenance building to the Camaro, and the vehicle then sped off. Barnett testified he and his co-workers checked behind the maintenance facility where they found E.R. on the ground.

{¶ 12} Christopher Hostettler, an officer with the Columbus Division of Police, testified he responded to Smith Road Park on the report that there may be a second victim. Officer Hostettler testified he located E.R. on a narrow footpath in a secluded area of the park and that E.R. was not moving and was barely breathing. Additionally, Officer Hostettler observed E.R. was bleeding from the head and had sustained a gunshot wound below her left eye. Officer Hostettler testified law enforcement recovered used syringes from the ground where he found E.R. but that no shell casings were recovered from the scene. The syringes did not have sufficient material on them to conduct DNA testing or fingerprint analysis.

{¶ 13} Another officer with the Columbus Division of Police, Nathan Tripp, responded to Duncan's residence on Miller Avenue and observed an "immense amount" of blood just inside the door. (Tr. Vol. II at 224.) Subsequent DNA analysis determined D.H. was the major contributor of the blood.

{¶ 14} E.R. also testified that she and D.H. were active drug users living in her vehicle in June 2019. E.R. testified she and D.H. would purchase drugs from Duncan and then resell those drugs to make money. According to her testimony, E.R. saw Duncan nearly every day for five months.

{¶ 15} Around 11:30 p.m. on June 11, 2019, E.R. said she and D.H. went to Duncan's house to make a drug purchase. E.R. testified D.H. went inside while she remained in her vehicle. A short time later, E.R. said Duncan, D.H., and an individual she did not know came outside, and that Duncan then put a gun to her chest and ordered her out of her car. E.R. testified Duncan placed her and D.H. against the back wall of the house and ordered them not to speak or look up. E.R. said Duncan and the other man then beat D.H., punching and kicking him in the face and ribs. E.R. said Duncan searched her and her car before calling a third man and instructing the man to come to the house and rape E.R. Additionally, E.R. said Duncan removed her kitten from her car and threw it over the backyard fence, and elbowed E.R. in the face, causing her lip to split. When E.R. fell to the ground, she said Duncan pulled her back up by her hair.

{¶ 16} E.R. testified that after Duncan found the stash can in the vehicle, he took E.R. and D.H. into the house and continued to pistol whip them, breaking E.R.'s nose and causing D.H. to bleed profusely. Next, E.R. said Duncan took her phone, money, and identification, and he threatened to kill her family. E.R. described Duncan discussing how he would kill E.R. and D.H. and taking her into the kitchen where she watched him fill two syringes with fentanyl.

{¶ 17} Next, E.R. said Duncan forced her and D.H. back into her vehicle with the two other men and that Duncan followed in his black Camaro as they drove to Smith Road Park. Once at the park, E.R. said one of the other men removed them from the car at gunpoint and Duncan, carrying a gun, led them down a path behind the maintenance building. E.R. testified Duncan told them he would shoot them both if they did not inject themselves with the syringes. E.R. testified she injected herself with the syringe, lost consciousness, and subsequently woke up in an intensive care unit, blind in her right eye from a gunshot wound to her head.

{¶ 18} Both E.R. and D.H. identified Duncan from a photographic lineup.

{¶ 19} The first defense witness, James Mitchell, testified he remembered a day that E.R. and D.H. came to a bar where he worked to try to sell stolen goods. Mitchell said he noticed both D.H. and E.R. were injured when he met them, but he could not remember the day or the month when this event occurred. Additionally, Mitchell testified he had been convicted of three felonies and had sold opiates.

{¶ 20} The next defense witness, Regita Gaspard, testified Duncan had stayed at her home "around May and June" of 2019. (Tr. Vol. IV at 599.) Gaspard testified her home has an alarm system and that she enforces a strict 11:00 p.m. "lockdown." (Tr. Vol. IV at 600.) Gaspard was not certain if Duncan was staying at her home on June 11, 2019, but she testified it was possible he was there that day because it was in the general timeframe Duncan was staying at her house.

{¶ 21} The third defense witness was Duncan's former attorney, Regina Griffith, who testified she had interviewed E.R. when she was involved in the case and E.R. admitted to using heroin. Additionally, Griffith testified E.R. told her she was "[a] hundred percent sure" that Duncan was the perpetrator.

{¶ 22} After Griffith's testimony, defense counsel informed the trial court that Duncan wished to testify in his own defense. The trial court advised Duncan of his rights and Duncan decided not to testify. However, Duncan later changed his mind and, after the trial court allowed the defense to reopen its case, Duncan took the stand.

{¶ 23} Duncan testified he had previously been convicted of robbery and that he started dealing drugs upon his release from prison. Duncan stated he had known D.H. and E.R. for several years and admitted he was their drug dealer. According to his testimony, Duncan's house had been burglarized several times, so he decided to sublet the residence to a friend of D.H.'s and E.R.'s named "Boston." (Tr. Vol. V at 666-67.) Duncan testified Boston moved into the residence approximately the third week of May while Duncan moved in with his friend, Gaspard. Duncan said he did not utilize a written sublease agreement for this arrangement. Additionally, Duncan said he did not know who was responsible for the burglaries but that he bought two dogs for protection. Duncan testified he had called police about the burglaries but that he never made a formal report because he had been told there was nothing that could be done.

{¶ 24} Duncan further testified that once he moved in with Gaspard, he would occasionally pay her rent and that he "tried to be there at 11:00 every night." (Tr. Vol. V at 671.) Duncan admitted there were some nights he did not stay at Gaspard's residence because he knew he could not get back by the 11:00 p.m. curfew. Duncan testified he first learned there had been an incident at his home when Gaspard showed him an online post. On cross-examination, Duncan testified he was unsure the last time D.H. was at his home,

but he was certain D.H. was never bleeding while at his home. Duncan additionally denied there were syringes at his home matching those found at Smith Road Park and he denied personally owning a firearm.

{¶ 25} Following deliberations, the jury found Duncan guilty of all seven charges and specifications. The trial court conducted a sentencing hearing on March 12, 2021 and sentenced Duncan to an aggregate term of 32 to 37 years in prison. The trial court journalized Duncan's convictions and sentence in a March 16, 2021 judgment entry. Duncan timely appeals.

## II. Assignments of Error

{¶ 26} Through counsel, Duncan assigns the following eight assignments of error for our review:

> I. It was error for the court to allow the indictment to be amended on the first day of trial and this denied apppellant his right to procedural due process.
>
> II. The verdict was againstthe manifest wright of the evidence.
>
> III. The State of Ohio denied appellant due process of law by failing to provide evidentiary documents prior to using them at trial. This could also be considered Brady Evidence not turned over to appellant.
>
> IV. The jury instruction regarding an alibi witness and flight instruction was error.
>
> V. It was a violation of Double Jeopardy to add a firearm specification to an offense that was alleged was only "Agravated" due to the use of a gun, creating dual sentences for one alleged act, and the gun specifications wrongly were imposed mutilple times, consecutive to each other.
>
> VI. All errors taken together are cumulative and served to deny appellant a fair trial.
>
> VII. The kidnapping sentence should have merged with the other aggravated robbery and felonious assault sentence.
>
> VIII. The court denied due process to defendant - appellant when it considered unproven acts of defendant while incarcerated as a basis for the 32-37 year sentence.

(Sic passim.)

{¶ 27} Additionally, Duncan filed a pro se brief asserting the following three supplemental assignments of error:

> I. It was error for the sentence of appellant to be ordered to be mandatory.
>
> II. The kidnapping to facilitate an aggravated robbery/felonious assault should have merged for sentencing.
>
> III. The jury forms were improper and mislead the jury.

For ease of discussion, we address Duncan's assignments of error and pro se assignments of error out of order.

## III. First Assignment of Error and Third Supplemental Assignment of Error – Amendment to Indictment and Jury Verdict Forms

{¶ 28} Duncan's first assignment of error and his third supplemental assignment of error are interrelated, and we address them jointly. In his first assignment of error, Duncan argues the trial court erred in allowing the state to amend the indictment just prior to the start of trial. In his third supplemental assignment of error, Duncan argues the trial court additionally erred in changing the jury verdict forms to reflect the amended indictment.

{¶ 29} " 'Pursuant to Crim.R. 7(D), a court may, before, during or after a trial, amend an indictment due to any variance with the evidence, provided no change is made in the name or identity of the crime charged.' " *State v. Word*, 10th Dist. No. 17AP-367, 2019-Ohio-1733, ¶ 22, quoting *State v. V.J.*, 10th Dist. No. 13AP-799, 2014-Ohio-2618, ¶ 53. An appellate court reviews a trial court's decision to amend an indictment for an abuse of discretion. *Id.*, citing *V.J.* at ¶ 53, citing *State v. Smith*, 10th Dist. No. 03AP-1157, 2004-Ohio-4786, ¶ 10. An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983); *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, ¶ 34, citing *State v. Adams*, 62 Ohio St.2d 151, 157 (1980). To constitute reversible error on appeal, the defendant must show the trial court's decision to allow the amendment of the indictment prejudiced his defense. *Word* at ¶ 22, citing *V.J.* at ¶ 53, citing *Smith* at ¶ 10.

{¶ 30} The original indictment here stated Duncan "did have a deadly weapon, to wit: Handgun Taurus 9mm, on or about his person or under his control and either displayed the weapon, brandished it, indicated that he possessed it, or used it." (Indictment at 1.) At a pretrial conference on February 19, 2021, the trial court granted the state's request to amend the indictment, over Duncan's objection, to remove "[H]andgun Taurus 9mm" and replace it with "firearm." (Feb. 19, 2021 Tr. at 11-12.) The trial court noted the requested amendment did not change "the substance or the nature of the charges." (Feb. 19, 2021 Tr. at 12.) Additionally, the trial court noted the amendment to the indictment to the more general "firearm" reflected the jury verdict forms, stating "[t]hat's the way our verdict forms go back," and specifying "[i]t goes back as a firearm." (Feb. 19, 2021 Tr. at 12.)

{¶ 31} Neither R.C. 2911.01 nor 2903.11 require proof of a specific type of deadly weapon. Thus, we agree with the trial court that amending the indictment from "Handgun Taurus 9mm" to "firearm" did not change the name or identity of the charged offense. *See* Crim.R. 7(D). Additionally, Duncan does not articulate any prejudice to his defense as a result of the amendment to the indictment. *V.J.* at ¶ 55 (where the amendment to the indictment does not change the name or identity of the charged offenses, an appellant must show the amendment somehow prejudiced his defense in order to constitute reversible error), citing *Smith* at ¶ 10. While the amended language is less specific than the original language, the amended indictment still required the state to prove Duncan had a firearm on or about his person or under his control as the aggravated robbery and felonious assault statutes require. R.C. 2911.01; R.C. 2903.11. Though Duncan argues it is prejudicial for the state to amend the indictment from the specific to the generic, he does not articulate any actual prejudice or identify any authority supporting his position. Instead, Duncan argues only that the amendment occurred "late in the game." (Appellant's Brief at 12.) However, Crim.R. 7(D) specifically allows an amendment to the indictment before, during, or after trial. Accordingly, Duncan's argument regarding prejudice lacks merit.

{¶ 32} Turning to the verdict forms, Duncan does not challenge the adequacy of the verdict forms, themselves. *See, e.g.*, *State v. Khalif*, 10th Dist. No. 23AP-274, 2024-Ohio-2239, ¶ 37 (finding that "because the jury verdict form here did not contain either the degree of the offense or the presence of the aggravating element, the jury verdict form could only

constitute a finding of guilty of the least degree of the offense charged"), citing *State v. McDonald*, 137 Ohio St.3d 517, 2013-Ohio-5042, ¶ 24-25 (explaining R.C. 2945.75 requires a verdict form to contain either the degree of the offense or the elements necessary to distinguish a greater degree of the offense from the lesser degree of the offense). Instead, Duncan reiterates the same argument he made regarding the amendment to the indictment, asserting the change to the verdict forms from the specific type of weapon to the more general "firearm" improperly lowered the state's burden of proof.

{¶ 33} Contrary to Duncan's argument, the record does not indicate the trial court changed the verdict forms. Instead, the trial court explained, when it agreed to amend the indictment, that the amendment to the indictment would reflect what was already on the verdict forms. Even if we construe Duncan's argument to be that the verdict forms should have contained the specific firearm contained in the original indictment, Duncan's argument is unpersuasive. Having already concluded the amendment to the indictment properly reflected the statutory offenses and did not change the name or identity of the offense charged, the corresponding language in the jury verdict forms similarly did not change the state's burden of proof.

{¶ 34} Because the trial court did not abuse its discretion in granting the state's motion to amend the indictment and did not err in using jury verdict forms that reflected the amended indictment, we overrule Duncan's first assignment of error and his third supplemental assignment of error.

## IV. Second Assignment of Error – Manifest Weight of the Evidence

{¶ 35} In his second assignment of error, Duncan argues his convictions are against the manifest weight of the evidence.

{¶ 36} When presented with a manifest-weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient, competent, credible evidence supports the jury's verdict. *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4738, ¶ 32, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the [manifest] weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387,

quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). Determinations of credibility and weight of the testimony are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 37} An appellate court considering a manifest-weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 38} Duncan does not identify any specific conflicts in the evidence as the basis of his manifest weight challenge. *See State v. Tate*, 140 Ohio St.3d 442, 2014-Ohio-3667, ¶ 20 ("a prerequisite for any reversal on manifest-weight grounds is conflicting evidence"). Instead, he argues more generally that there was "no specific documentary evidence" connecting him to the offenses and that the investigation into the offense was flawed for not identifying any alleged additional perpetrators. (Appellant's Brief at 12.) We are mindful, however, that " 'a lack of physical evidence, standing alone, does not render [a defendant's] conviction against the manifest weight of the evidence.' " *State v. Murray*, 10th Dist. No. 16AP-16, 2017-Ohio-949, ¶ 38, quoting *State v. Peeples*, 10th Dist. No. 13AP-1026, 2014-Ohio-4064, ¶ 21, citing *State v. Conner*, 10th Dist. No. 12AP-698, 2013-Ohio-2773, ¶ 12. " 'If [witness] testimony is believed then the lack of fingerprints, DNA, footprints or any other [type] of physical evidence does not render the conviction against the manifest weight of the evidence.' " *Peeples* at ¶ 21, quoting *State v. Jackson*, 7th Dist. No. 09 JE 13, 2009-Ohio-6407, ¶ 16 (concluding a conviction based on victim's testimony identifying the defendant was not against the manifest weight of the evidence). Both E.R. and D.H.

testified they knew Duncan and identified him as the perpetrator, undermining Duncan's argument that he was not involved. Additionally, E.R. and D.H. both provided highly detailed testimony about the events at Duncan's residence, in the car, and at Smith Road Park.

{¶ 39} Essentially, Duncan argues under this assignment of error that the jury lost its way in not believing his version of events. However, a conviction is not against the manifest weight of the evidence where the trier of fact believed the state's version of events over the defendant's version. *State v. Oggs*, 10th Dist. No. 17AP-900, 2018-Ohio-3577, ¶ 22, citing *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 43. As we noted above, the jury remains free to believe "all, part, or none of a witness's testimony." *Raver* at ¶ 21. Despite Duncan's testimony that he no longer lived at his house and that he was not involved, both E.R. and D.H. consistently identified Duncan as the perpetrator both to investigators and throughout the trial. In light of the evidence discussed above, as well as the record in its entirety, we do not find the jury clearly lost its way in concluding Duncan was the perpetrator of the offenses.

{¶ 40} Because the manifest weight of the evidence supports Duncan's convictions, we overrule Duncan's second assignment of error.

## V. Third Assignment of Error – *Brady* Violation

{¶ 41} In his third assignment of error, Duncan argues the state violated his right to due process pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to provide him with evidence of Gaspard's Facebook posts.

{¶ 42} Under *Brady*, "the 'suppression by the prosecution of evidence favorable to an accused * * * violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' " *State v. Bethel*, 10th Dist. No. 09AP-924, 2010-Ohio-3837, ¶ 17, quoting *Brady* at 87. The duty to disclose encompasses both exculpatory evidence and impeachment evidence. *Salinas*, 2010-Ohio-4738, at ¶ 19, citing *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999), citing *United States v. Bagley*, 473 U.S. 667, 676 (1985). Evidence is " 'material' within the meaning of *Brady* only if there exists a 'reasonable probability' that the result of the trial would have been

different had the evidence been disclosed to the defense." *Bethel* at ¶ 18, quoting *Kyles v. Whitely*, 514 U.S. 419, 433 (1995).

{¶ 43} Duncan argues the state should have disclosed, pursuant to *Brady*, evidence of Gaspard's Facebook posts used by the state at trial to impeach Gaspard's testimony about enforcing an 11:00 p.m. lockdown at her residence. Gaspard's social media posts were publicly available information, not evidence in the sole possession of the state. Where the subject information is publicly available and not under the state's control, the state cannot suppress the evidentiary materials within the meaning of *Brady*. *State v. Mowery*, 2d Dist. No. 2023-CA-40, 2024-Ohio-4507, ¶ 18 ("[u]nder *Brady*, the State has the duty to disclose material evidence in its possession," but " '[w]here the state has no control over evidentiary materials, it "is incapable of suppressing them in violation of *Brady*" ' "), quoting *State v. Azali*, 8th Dist. No. 112299, 2023-Ohio-4643, ¶ 72, quoting *State v. Lawson*, 64 Ohio St.3d 336, 344 (1992); *State v. Finley*, 8th Dist. No. 113247, 2024-Ohio-2636, ¶ 36 (no *Brady* violation where state failed to disclose social media posts from a witness because the social media posts are publicly available information and therefore "neither in the State's sole possession nor suppressed by the State,"), citing *United States v. Delgado*, 350 F.3d 520, 527 (6th Cir.2003) ("*Brady* does not apply to materials that are not 'wholly within the control of the prosecution' "), quoting *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir.1998); *State v. McGuire*, 8th Dist. No. 105732, 2018-Ohio-1390, ¶ 24 ("[t]here is no need to require the state to 'disclose' material that is readily available to the defense").

{¶ 44} Because we find no *Brady* violation, Duncan's argument lacks merit. Thus, we overrule Duncan's third assignment of error.

## VI. Fourth Assignment of Error – Jury Instructions

{¶ 45} In his fourth assignment of error, Duncan argues the trial court erred in instructing the jury. More specifically, Duncan asserts the trial court erred when it instructed the jury on flight as consciousness of guilt and additionally erred when it failed to instruct the jury on alibi. Although Duncan objected to the flight instruction, Duncan did not object to the failure to provide an alibi instruction. We examine each jury instruction separately.

**A. Flight as Consciousness of Guilt**

{¶ 46} Duncan first argues the trial court erred when it instructed the jury on flight as consciousness of guilt. At trial, Duncan's counsel objected to the flight instruction and the trial court overruled the objection.

{¶ 47} " 'A trial court is responsible for providing all jury instructions that are relevant and necessary for the jury to weigh the evidence and determine the facts.' " *State v. Ross*, 10th Dist. No. 17AP-141, 2018-Ohio-3027, ¶ 31, quoting *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 59. " 'A jury instruction is proper when it adequately informs the jury of the law.' " (Further quotations and citations omitted.) *Id.*, quoting *Jennings* at ¶ 59. We review a trial court's decision to provide a requested instruction for an abuse of discretion. *State v. Hall*, 10th Dist. No. 21AP-137, 2023-Ohio-837, ¶ 34, citing *State v. Dovangpraseuth*, 10th Dist. No. 05AP-88, 2006-Ohio-1533, ¶ 30. An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Darmond*, 2013-Ohio-966, at ¶ 34, citing *Adams*, 62 Ohio St.2d at 157. However, whether the evidence warrants a particular jury instruction is a question of law we review de novo. *Hall* at ¶ 34, citing *State v. Daniels*, 10th Dist. No. 18AP-626, 2019-Ohio-1791, ¶ 4.

{¶ 48} The trial court instructed the jury as follows:

> Testimony has been admitted indicating that the Defendant fled the scene. You are instructed that leaving the scene alone does not raise a presumption of guilt, but it may tend to indicate the Defendant's awareness of guilt. If you find that the facts do not support that the Defendant fled the scene or if you find that some other motive prompted the Defendant's conduct if you're unable to decide what the Defendant's motivation was, then you should not consider this evidence for any purpose.
>
> However, if you find that the facts support the Defendant engaged in such conduct and if you find that the Defendant was motivated -- motivated by awareness of guilt, you may, but are not required to, consider that evidence in determining whether the Defendant is guilt of the crime or crimes charged. You alone will determine what weight, if any, to give to this evidence.

(Mar. 5, 2021 Tr. Vol. V at 757-58.) Duncan does not argue the flight instruction was an incorrect statement of law, nor does he argue there was no evidence of flight. Instead, he

argues the evidence of flight here is not the type of flight evidence to warrant this instruction. We disagree.

{¶ 49} As this court has explained, a jury instruction on flight as consciousness of guilt is appropriate when there is sufficient evidence in the record to support the instruction. *State v. Robinson*, 10th Dist. No. 17AP-853, 2019-Ohio-558, ¶ 29 (noting evidence of flight from the scene is admissible to show the accused's consciousness of guilt), citing *State v. Grindstaff*, 12th Dist. No. CA2013-09-074, 2014-Ohio-2581, ¶ 29. At trial, the state presented evidence that Duncan fled the scene in his vehicle after shots were fired. Barnett testified he saw Duncan's Camaro drive away from the scene at a high rate of speed immediately after the gunshots. Though Duncan asserts this is not the type of flight the instruction is meant to cover, he does not elaborate on a definition of flight he deems more appropriate. There is no requirement that the flight from the scene occur during the active pursuit of the defendant by law enforcement in order to warrant the flight instruction. *See State v. Shine-Johnson*, 10th Dist. No. 17AP-194, 2018-Ohio-3347, ¶ 48 (evidence that appellant left the scene on foot after the shooting before any law enforcement arrived on the scene could support an inference of flight as consciousness of guilt and, thus, was sufficient to warrant the flight instruction). Instead, a jury could infer from this evidence that Duncan fled the scene because of consciousness of guilt. Therefore, there was sufficient evidence to warrant the flight instruction, and the trial court did not abuse its discretion in providing the instruction.

### B. Alibi Instruction

{¶ 50} Additionally, under this assignment of error, Duncan argues the trial court erred in failing to instruct the jury on alibi. Duncan did not request an alibi instruction at trial or object to the trial court's failure to sua sponte provide an alibi instruction. Thus, Duncan has waived all but plain error. *State v. Lipkins*, 10th Dist. No. 16AP-616, 2017-Ohio-4085, ¶ 28, citing *State v. Cook*, 65 Ohio St.3d 516, 527 (1992). An appellate court recognizes plain error with utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 51} For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). A court will reverse on plain error based on an erroneous jury instruction only upon a showing that the outcome " 'clearly would have been different absent the error.' " *State v. Petty*, 10th Dist. No. 11AP-716, 2012-Ohio-2989, ¶ 15, quoting *State v. Zachery*, 10th Dist. No. 08AP-451, 2009-Ohio-1180, ¶ 8.

{¶ 52} Crim.R. 12.1 requires a defendant to file a notice of alibi if he proposes to offer alibi evidence. Duncan filed a notice of alibi on February 25, 2021. At trial, Duncan testified he was not at the scene of the offenses but instead was staying at Gaspard's residence. " 'Where a defendant files a timely notice of alibi, presents evidence to support the contention, and relies on alibi as the sole defense, the trial court has a statutory duty pursuant to R.C. 2945.11 to charge the jury on alibi, whether or not defendant requests such an instruction.' " *State v. Green*, 2d Dist. No. 28614, 2020-Ohio-5206, ¶ 95, quoting *State v. Gibson*, 8th Dist. No. 98725, 2013-Ohio-4372, ¶ 106, citing *State v. Frost*, 164 Ohio App.3d 61, 2005-Ohio-5510 (2d Dist.).

{¶ 53} Although Duncan filed a notice of alibi and testified regarding his alibi defense, Duncan did not request a jury instruction on the alibi defense. This court has noted the difficulty in demonstrating plain error from failure to sua sponte provide an alibi instruction because the failure to give the instruction does not affect the outcome of the trial. *State v. Reddy*, 10th Dist. No. 09AP-868, 2010-Ohio-3892, ¶ 23. "An alibi defense is a denial that the defendant committed the act. A jury instruction on an alibi defense is nothing more than a reminder that the defendant presented evidence of an alibi." *Id.*, citing *State v. Sims*, 3 Ohio App.3d 321, 328 (8th Dist.1981). "Thus, if a jury convicts a defendant who presented evidence of an alibi, the jury must have considered and rejected the defendant's alibi evidence and instead, found the defendant guilty beyond a reasonable doubt." *Id.* Here, though Duncan testified to his alibi defense, as we noted in our resolution of Duncan's second assignment of error, both D.H. and E.R. presented ample evidence of Duncan's involvement. In light of the evidence presented by the state, we cannot find that an alibi defense instruction to the jury would have affected the outcome of the trial. *Reddy*

at ¶ 24; *Green* at ¶ 101 (where the jury heard both the defendant's alibi evidence and the state's evidence identifying the defendant as the perpetrator, a reviewing court will not find plain error from the failure to give the alibi instruction). Thus, Duncan cannot demonstrate plain error from the trial court's failure to sua sponte provide the alibi instruction.

{¶ 54} Because the trial court did not err in instructing the jury on flight as consciousness of guilt and did not plainly err in failing to sua sponte instruct the jury on alibi, we overrule Duncan's fourth assignment of error.

## VII. Sixth Assignment of Error – Cumulative Error

{¶ 55} In his sixth assignment of error, Duncan argues the cumulative effect of the errors at his trial resulted in him being denied a fair trial.

{¶ 56} Duncan relies on *State v. DeMarco*, 31 Ohio St.3d 191 (1987), for the proposition that although errors at trial singularly "may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a defendant of the constitutional right to a fair trial." *Id.* at paragraph two of the syllabus. Duncan urges us to conclude that the many alleged errors at his trial resulted in a fundamentally unfair trial.

{¶ 57} Duncan asserts the assignments of error raised in his appellate brief are sufficient to implicate the doctrine of cumulative error. However, as we explained in our resolution of Duncan's first through fourth assignments of error, the only error Duncan has demonstrated is the trial court's failure to sua sponte instruct the jury on alibi, but that error did not rise to the level of plain error. Thus, Duncan is unable to point to two or more cumulative errors that would warrant reversal. " '[W]here there are not multiple errors, the doctrine of cumulative error is not applicable.' " *State v. Wade*, 10th Dist. No. 22AP-560, 2023-Ohio-3490, ¶ 86, quoting *State v. Teitelbaum*, 10th Dist. No. 14AP-310, 2016-Ohio-3524, ¶ 124; *State v. Moore*, 10th Dist. No. 11AP-1116, 2013-Ohio-3365, ¶ 61 (where a case "presents no errors to cumulate," the doctrine of cumulative errors does not apply). Duncan cannot establish he is entitled to relief under the doctrine of the cumulative effect of errors simply by combining his unsuccessful arguments together. *Wade* at ¶ 86, citing *State v. Hodson*, 10th Dist. No. 18AP-242, 2019-Ohio-1734, ¶ 50, citing *State v. Montgomery*, 148 Ohio St.3d 347, 2016-Ohio-5487, ¶ 134.

{¶ 58} We overrule Duncan's sixth assignment of error.

## VIII. Seventh Assignment of Error and Second Supplemental Assignment of Error – Merger

{¶ 59} In both his seventh assignment of error and his second supplemental assignment of error, Duncan argues the trial court erred in failing to merge his kidnapping convictions with his convictions of either aggravated robbery or felonious assault.

{¶ 60} In reviewing a trial court's determination of whether a defendant's offenses should merge for purposes of conviction, an appellate court reviews the trial court's determination de novo. *State v. Flood*, 10th Dist. No. 18AP-206, 2019-Ohio-2524, ¶ 25, citing *State v. S.S.*, 10th Dist. No. 13AP-1060, 2014-Ohio-5352, ¶ 28, citing *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1. " 'Appellate courts apply the law to the facts of individual cases to make a legal determination as to whether R.C. 2941.25 allows multiple convictions. That facts are involved in the analysis does not make the issue a question of fact deserving of deference to a trial court.' " *S.S.* at ¶ 28, quoting *Williams* at ¶ 25.

{¶ 61} R.C. 2941.25 provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶ 62} Duncan argues the trial court erred when it failed to merge the offense of kidnapping with the offense of aggravated robbery and/or felonious assault for purposes of sentencing. "When the defendant's conduct constitutes a single offense, the defendant may be convicted and punished only for that offense. When the conduct supports more than one offense, however, a court must conduct an analysis of allied offenses of similar import to determine whether the offenses merge or whether the defendant may be convicted of separate offenses." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, ¶ 24.

{¶ 63} "To determine whether two offenses are allied offenses that merge into a single conviction, a court must evaluate three separate factors: the conduct, the animus, and the import." *State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 42, citing *Ruff* at paragraph one of the syllabus. "If any of the following is true, the offenses cannot merge and the defendant may be convicted and sentenced for multiple offenses: (1) the offenses are dissimilar in import or significance—in other words, each offense caused separate, identifiable harm, (2) the offenses were committed separately, or (3) the offenses were committed with separate animus and motivation." *Ruff* at ¶ 25. Ultimately, if the harm resulting from each offense is separate and identifiable, the offenses are of dissimilar import and do not merge. *Harris* at ¶ 42, citing *Ruff* at ¶ 25.

{¶ 64} In conducting an analysis of whether two offenses are allied offenses of similar import, the Supreme Court of Ohio directs an appellate court to look beyond the statutory elements and to consider the defendant's conduct. "A trial court and the reviewing court on appeal when considering whether there are allied offenses that merge into a single conviction under R.C. 2941.25(A) must first take into account the conduct of the defendant. In other words, how were the offenses committed?" *Ruff* at ¶ 25.

{¶ 65} Duncan argues the state relied on the same conduct to support his convictions of kidnapping and both aggravated robbery and felonious assault. He asserts the kidnapping was incidental to the commission of the other offenses and only lasted as long as it took to facilitate the other offenses. *See State v. Abdullahi*, 10th Dist. No. 18AP-222, 2018-Ohio-5146, ¶ 43, citing *State v. Sidibeh*, 192 Ohio App.3d 256, 2011-Ohio-712, ¶ 58, 61 (10th Dist.) (holding that where the kidnapping was "merely incidental" to, and stemmed from the same conduct as, the offense of aggravated robbery, the two offenses must merge). However, D.H. testified that once Duncan forced him and E.R. back inside the house, Duncan held them inside for several hours. The testimony established the robbery occurred outside the house and the assault occurred at several different points throughout the night, but there were long periods of time where D.H. and E.R. were held inside the house in between the robbery and the assault. Both D.H. and E.R. testified they were being held in the house while they listened to Duncan and his associates discuss various ways to kill them. Additionally, Duncan separately orchestrated the transport of D.H. and E.R. from the house to the park where he planned to force them at gunpoint to

inject themselves with a lethal dose of fentanyl. Thus, the restraint of D.H.'s and E.R.'s liberty was not "merely incidental" to the commission of the other offenses, nor did it stem from the same conduct as the aggravated robbery or felonious assault. *Id*. at ¶ 43, quoting *Sidibeh* at ¶ 61; *see also State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, ¶ 107 ("[w]hen 'the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus to sustain separate convictions,' " but "when 'the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions' "), quoting *State v. Logan*, 60 Ohio St.2d 126 (1979), syllabus.

{¶ 66} Based on this record, the trial court did not err when it did not merge Duncan's kidnapping convictions with his convictions of either felonious assault or aggravated robbery. Thus, we overrule Duncan's seventh assignment of error and his second supplemental assignment of error.

## IX. Fifth Assignment of Error – Firearm Specifications

{¶ 67} In his fifth assignment of error, Duncan argues the imposition of the firearm specifications with his conviction of aggravated robbery constitutes a double jeopardy violation. Duncan asserts that because the offense of aggravated robbery could only be deemed aggravated by the use of a firearm, double jeopardy protects him from multiple punishments from the possession or use of the same gun in the form of an accompanying firearm specification. Additionally, under his fifth assignment of error, Duncan argues the trial court erred in imposing multiple firearm specifications to run consecutively. We address each of these arguments in turn.

### A. Double Jeopardy

{¶ 68} Duncan first argues the firearm specification attached to his aggravated robbery conviction violates his protection against double jeopardy. We construe Duncan's argument as asserting a double jeopardy violation from the trial court's failure to merge the firearm specification with the aggravated robbery conviction.

{¶ 69} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, applicable to the states under the Fourteenth Amendment and Article I,

Section 10 of the Ohio Constitution, "ensures that a state may not put a defendant in jeopardy twice for the same offense." *State v. Anderson*, 138 Ohio St.3d 264, 2014-Ohio-542, ¶ 54, citing *Benton v. Maryland*, 395 U.S. 784 (1969). The protection against multiple punishments for the same offense is among the protections afforded under the Double Jeopardy Clause. *State v. Taylor-Hollingsworth*, 10th Dist. No. 22AP-527, 2023-Ohio-4435, ¶ 12, citing *Ruff*, 2015-Ohio-995, at ¶ 10. As noted above, a determination of whether a defendant's offenses should merge for purposes of conviction is a question of law we review de novo. *Flood*, 2019-Ohio-2524, at ¶ 25.

{¶ 70} Pursuant to R.C. 2941.25(A), "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." Though Duncan argues he could not face additional punishment for the firearm specification attached to his aggravated robbery conviction, the Supreme Court of Ohio has already considered and rejected this argument. In *State v. Ford*, 128 Ohio St.3d 398, 2011-Ohio-765, the Supreme Court explained that a firearm specification is "contingent upon an underlying felony conviction" and "merely a sentencing provision that requires an enhanced penalty upon certain findings." *Id*. at ¶ 16. Thus, the court held a firearm specification under R.C. 2941.145 is a penalty enhancement, not a criminal offense. *Id*. at paragraph one of the syllabus. As such, "[p]enalties for a specification and its predicate offense do not merge under R.C. 2941.25." *Id*. at paragraph two of the syllabus.

{¶ 71} Accordingly, the imposition of the firearm specification did not violate Duncan's protections against double jeopardy. *Id*. at ¶ 19 (offense of discharging a firearm at or into a habitation and the accompanying firearm specification do not merge because the firearm specification "is a penalty enhancement, not a criminal offense"); *State v. Horton*, 10th Dist. No. 14AP-997, 2015-Ohio-4039, ¶ 70 ("the having weapons while under disability offense and the firearm specification attached to the offense of murder are not allied offenses of similar import as defined in R.C. 2941.25, because the firearm specification is a penalty enhancement, not a separate criminal offense"). Thus, Duncan's double jeopardy argument lacks merit.

**B. Imposition of Multiple Firearm Specifications**

{¶ 72} Duncan additionally argues under his fifth assignment of error the trial court erred in imposing multiple firearm specifications as part of his sentence.

{¶ 73} At issue under this assignment of error are the firearm specifications accompanying Duncan's convictions of two counts of aggravated robbery and two counts of felonious assault. The trial court imposed the three-year firearm specification prison sentence for each of these four counts and ordered the specifications to run consecutive to each other. Duncan argues the imposition of consecutive sentences on the firearm specifications punishes him multiple times for the same conduct, to wit: the use of the same gun throughout the incident. We disagree.

{¶ 74} Pursuant to R.C. 2953.08(G)(2), an appellate court may modify or vacate a felony sentence "only if we clearly and convincingly find either: (1) the record does not support the sentencing court's findings under certain statutes, including R.C. 2929.14(C)(4); or (2) the sentence is otherwise contrary to law." *State v. Payne*, 10th Dist. No. 23AP-335, 2024-Ohio-4698, ¶ 115, citing *State v. Jones*, 163 Ohio St.3d 242, 2020-Ohio-6729, ¶ 30-39. Duncan argues sentencing him to consecutive terms on the firearm specifications violates the terms of R.C. 2929.14.

{¶ 75} Duncan was convicted of seven felonies, four of which were aggravated robbery and felonious assault, and the firearm specifications were of the type listed in R.C. 2929.14(B)(1)(a). Pursuant to R.C. 2929.14(B)(1)(g), the trial court was required to impose prison sentences for two of the firearm specifications. *Payne* at ¶ 116; *State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 49 ("R.C. 2929.14(B)(1)(g) required the trial court to impose a prison term for each of the 'two most serious specifications' of which [appellant] was convicted"), quoting *State v. Price*, 10th Dist. No. 13AP-1085, 2014-Ohio-4065, ¶ 11. Further, R.C. 2929.14(B)(1)(g) gives the trial court discretion to impose a sentence on " 'any or all of the remaining specifications.' " *Payne* at ¶ 116, quoting R.C. 2929.14(B)(1)(g); *Harris* at ¶ 50.

{¶ 76} We reiterate, as we explained above, that a firearm specification is a penalty enhancement, not a separate offense. *Ford* at ¶ 19. Thus, R.C. 2929.14(C)(4), the consecutive sentencing statute, does not apply to penalty enhancing specifications. *Payne* at ¶ 117 (noting "R.C. 2929.14(C)(4), the consecutive sentencing statute, applies to 'multiple

prison terms [that] are imposed on an offender for convictions of multiple *offenses*' ") (emphasis sic), quoting 2929.14(C)(4).

{¶ 77} Although Duncan relies on R.C. 2929.14(B)(2)(b) for the proposition that he cannot be subject to more than one firearm specification where the felonies are part of the same act or transaction, we are mindful that R.C. 2929.14(B)(2)(b) only applies where R.C. 2929.14(B)(1)(g) does not apply.  R.C. 2929.14(B)(2)(b) ("[*e*]*xcept as provided in division (B)(1)(g) of this section*, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section for felonies committed as part of the same act or transaction") (emphasis added).  As explained above, Duncan's convictions were of the type listed in R.C. 2929.14(B)(1)(g).  Turning to R.C. 2929.14(B)(1)(g), which specifically applies to penalty enhancing specifications, there is no requirement the sentencing court make any specific findings before ordering additional penalty enhancing specifications to be served consecutively.  *Payne* at ¶ 119.  Because R.C. 2929.14(B)(1)(g) required the imposition of the first two firearm specifications, and the trial court had the discretion, pursuant to R.C. 2929.14(B)(1)(g), to impose the third and fourth penalty enhancing specifications, the imposition of these specifications at sentencing was not contrary to law.  *Payne* at ¶ 119.

{¶ 78} For these reasons, Duncan is unable to demonstrate the imposition of multiple firearm specifications unlawfully punished him multiple times for the same conduct.  Accordingly, we overrule Duncan's fifth assignment of error.

## X. First Supplemental Assignment of Error – Mandatory Sentence

{¶ 79} In his first supplemental assignment of error, Duncan argues the trial court erred in finding his felony sentences to be mandatory.

{¶ 80} As noted in our resolution of Duncan's fifth assignment of error, an appellate court will not reverse a trial court's sentencing decision unless the evidence is clear and convincing that either the record does not support the sentence or that the sentence is contrary to law.  *State v. Chandler*, 10th Dist. No. 04AP-894, 2005-Ohio-1961, ¶ 10, citing *State v. Maxwell*, 10th Dist. No. 02AP-1271, 2004-Ohio-5660, ¶ 27, citing *State v. Comer*, 99 Ohio St.3d 463, 2003-Ohio-4165, ¶ 10.  "In determining whether a sentence is contrary to law, an appellate court must review the record to determine whether the trial court considered the appropriate statutory factors, made the required findings, gave the reasons

for its findings, and properly applied the statutory guidelines." *Maxwell* at ¶ 27, citing *State v. Altalla*, 10th Dist. No. 03AP-1127, 2004-Ohio-4226, ¶ 7.

{¶ 81} In its judgment entry, the trial court specifically found "a prison term is mandatory as to Counts One, Two, Three, Four, Five, Six, and to the Specifications of Counts One, Two, Three, Four, Five and Six, pursuant to R.C. 2929.13(F) and R.C. 2929.03(C)(2)(a)(i). The sentence is mandatory because the Defendant has a prior Felony Two conviction of violence, to-wit: Robbery." (Jgmt. Entry at 2.) Duncan argues that although the firearm specifications may be mandatory, there is no statutory requirement that the sentences for the felony convictions of aggravated robbery, kidnapping, and felonious assault must also be mandatory. On this record, Duncan is incorrect.

{¶ 82} R.C. 2929.13(F) governs mandatory prison terms. *State v. Johnson*, 116 Ohio St.3d 541, 2008-Ohio-69, ¶ 9. As pertinent here, "R.C. 2929.13(F)(6) requires a mandatory prison term for a first-or second-degree felony if the offender has previously been convicted of or pled guilty to a first-or second-degree felony." *State v. Hand*, 149 Ohio St.3d 94, 2016-Ohio-5504, ¶ 3; *State v. Jordan*, 10th Dist. No. 11AP-679, 2012-Ohio-954, ¶ 7; *State v. Woodfork*, 10th Dist. No. 12AP-1092, 2013-Ohio-2428, ¶ 8 ("R.C. 2929.13(F)(6) requires a mandatory prison term for an offender convicted of a first-or second-degree felony when he or she was previously convicted of or pleaded guilty to aggravated murder, murder, or any first-or second-degree felony").

{¶ 83} Here, Duncan was convicted of two counts of aggravated robbery, two counts of kidnapping, and two counts of felonious assault, all felonies of the first or second degree. Additionally, Duncan does not dispute he had a prior second-degree felony conviction of robbery. Thus, Duncan's convictions of aggravated robbery, kidnapping, and felonious assault required mandatory prison terms pursuant to R.C. 2929.13(F)(6). As the trial court did not err in finding Duncan's convictions of aggravated robbery, kidnapping, and felonious assault required mandatory prison sentences, we overrule Duncan's first supplemental assignment of error.

## XI. Eighth Assignment of Error – Evidence at Sentencing Hearing

{¶ 84} In his eighth and final assignment of error, Duncan argues the trial court erred and deprived him of due process when it considered evidence of unproven acts during

the sentencing hearing. More specifically, Duncan asserts the trial court erred in considering Duncan's conduct while incarcerated before and during trial as a factor in his sentencing. As noted above, we will not reverse a trial court's sentencing decision unless the evidence is clear and convincing that either the record does not support the sentence or that the sentence is contrary to law. *Chandler* at ¶ 10; *Maxwell* at ¶ 27.

**{¶ 85}** During the sentencing hearing, the state provided Duncan's counsel with records of Duncan's institutional disciplinary history. Those records contained disciplinary action against Duncan, while incarcerated and awaiting trial, for possession of suboxone pills and a list of potential customers for the pills. The state argued during the sentencing hearing the disciplinary records indicated Duncan was continuing to sell drugs while incarcerated. As the state notes, Duncan did not object to the records of his institutional disciplinary history during the sentencing hearing, so our review is limited to plain error. Crim.R. 52(B); *Price*, 2014-Ohio-4065, at ¶ 7.

**{¶ 86}** Ohio courts have consistently held that, so long as they are not the sole basis for the resultant sentence, a trial court may consider a defendant's unindicted acts during the sentencing hearing. *State v. Griffin*, 6th Dist. No. WD-20-081, 2021-Ohio-3137, ¶ 19, citing *State v. Goodluck*, 6th Dist. No. L-16-1027, 2017-Ohio-778, ¶ 11; *State v. Staggs*, 4th Dist. No. 16CA19, 2017-Ohio-7368, ¶ 15 (uncharged crimes may be considered during sentencing as they are part of a defendant's social history); *State v. France*, 5th Dist. No. 15CA19, 2015-Ohio-4930, ¶ 20 ("Ohio courts have continually held uncharged crimes and dismissed charges pursuant to plea agreements may be considered by courts as factors during sentencing"); *State v. Bittner*, 12th Dist. No. CA2019-01-001, 2019-Ohio-3834, ¶ 23 ("Ohio law is clear that '[u]nindicted acts or not guilty verdicts can be considered in sentencing without resulting in error when they are not the sole basis for the sentence' "), quoting *State v. Thomas*, 8th Dist. No. 101263, 2014-Ohio-5153, ¶ 27; *State v. Reinthaler*, 7th Dist. No. 16 MA 0170, 2018-Ohio-2483, ¶ 13.

**{¶ 87}** The record here does not suggest the trial court relied solely on the disciplinary records in determining Duncan's sentence. Though the trial court mentioned that Duncan continued to receive drugs while incarcerated, there is no indication the trial court assigned any particular weight to this information. Instead, the focus of the trial court's sentence determination was the heinous nature of the offenses and the evidence

introduced at trial. Duncan makes no argument under this assignment of error that the trial court otherwise failed to consider the statutory sentencing factors or that his sentence is otherwise contrary to law. Thus, Duncan does not demonstrate error, let alone plain error, from the introduction of the institutional disciplinary records at the sentencing hearing.

{¶ 88} We overrule Duncan's eighth and final assignment of error.

## XII. Disposition

{¶ 89} Based on the foregoing reasons, the trial court did not err in amending the indictment, in drafting the jury verdict forms, in instructing the jury, in declining to merge Duncan's convictions, or in imposing Duncan's sentence. Additionally, the manifest weight of the evidence supports Duncan's convictions, and the state did not fail to disclose evidence pursuant to *Brady*. Having overruled Duncan's eight assignments of error and three supplemental assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

JAMISON and EDELSTEIN, JJ., concur.

_____